Mr. Justice Davis
delivered the opinion of the court:
This was a claim, preferred under the captured and abandoned property act, and presents one question for consideration which the case of The United States v. Nelson Anderson, decided at this term, did not contain. It appears that Elias Einstein, a resident of Macon, Georgia, was indebted, when’the war broke out, to Grossmayer, a resident of New York, for goods sold and money loaned, and that while the war was in. progress a correspondence on the subject was maintained through the medium of á person whosename isnot disclosed, who passed back and forth several times between Macon and New York. The communication between the parties resulted in Grossmayer - requesting Einstein to remit the amount due him in money or sterling exchange, or, if that were not possible, to invest the-sum in cotton and hold it for him until the close of the war.
In pursuance of this direction — as it is supposed money or ■ *131 sterling exchange could not be transmitted — Einstein purchased cotton for Grossmayer and informed him of it, who expressed himself satisfied with the arrangement. The cotton was after-wards shipped as Grossmayer’s to Abraham Einstein, at Savannah, who stored it there in his own nam.e, in order to prevent its seizure by the rebel authorities. It remained in store in this manner until the capture of Savannah, in December, 1864, when it was reported to our military forces as Grossmayer’s cotton, and taken by them and sent to New York and sold. ■
On this state of the case Grossmayer insists that he is within the protection of the captured and abandoned property act, but it is hard to see on what grouned he can base this claim for protection. It wasnatural that Grossmayer should desire to be paid, and creditable to Einstéin to wish to discharge his obligation to him, but the same thing can be said of very many persons who were similarly situated during the war, and if all persons in this condition had been allowed to do what was done in this case, it is easy to see that it would have produced great embarrassment and obstructed very materially the operations of the Army. It has been found necessary, as soon as war has commenced, that business intercourse should cease between the citizens of the respective parties engaged in it, and this necessity is so great that all writers on public law agree that it is unlawful, without any express declaration of the sovereign on the subject.
But Congress did not wish,to leave any one in ignorance of the effect of war in this regard, for as early as the 13th of July, 1861, it passed a non-intercourse act, which prohibited all commercial intercourse between the States in insurrection and the rest of the United States. It is true the President couid allow a restricted trade, if he thought proper; but in so far as he did allow it, it had to be conducted according to regulations prescribed by the Secretary of the Treasury.
There is no pretense, however, that this particular transaction was authorized by any one connected with the Treasury Department, and it was, therefore, not only inconsistent with the duties growing out of a state of war, but in open violation of a statute on the subject. A prohibition of all intercourse with an enemy during the war affects debtors and creditors on either side, equally with those who do not bear that relation to each other. We are not disposed to deny the doctrine that a resi *132 dent in tbe territory of one of tbe belligerents may have, in time of war, an agent residing in tbe territory of tbe other, to whom bis debtor could pay bis debt in money, or deliver to him property in discharge of it, but in such a case tbe agency must have been created before tbe war began, for there is no power to appoint an agent for any purpose after hostilities have actually commenced, and to this effect are all tbe authorities. Tbe reason why this cannot be done is obvious, for while tbe war lasts nothing which depends on commercial intercourse is permitted. In this case, if Einstein is to be considered as the agent of Grossmayer to buy the cotton, the act appointing Mm was illegal, because it was by means of a direct communication through a messenger who was, in some manner not stated in the record, able to pass, during the war, between Macon and New York. It was not necessary, to make the act unlawful, that Grossmayer should have communicated personally with Einstein. The business intercourse through a middle-man, which resulted in establishing the agency, is equally within the condemnation of the law.
Besides, if, as is conceded, Grossmayer was prohibited from trading directly with the enemy, how can the purchase in question be treated as lawful when it was made for him by an agent appointed after his own disability to deal at all with the insurgents was created ?
It is claimed that the purchase by Einstein was ratified by Grossmayer, and that it relieves the case of difficulty, but this is a mistaken view of the principle of ratification, for a transaction originally unlawful cannot be made any better by being-ratified.
In any aspect of this case, -whether the relation of debtor and creditor continued, or was changed to that of principal and agent, the claimant cannot recover.
As he was prohibited during the war from having any dealings with Einstein, it follows that nothing which both or either of them did in this case could have the effect to vest in him the title to the cotton in question.
Not being the owner of the property, he has no claim against the United States.
The judgment of the Court of Claims is reversed, and this cause is remanded to that court with directions to enter an order dismissing the petition.